Argued March 16, reversed and remanded with directions
June 25, petition for rehearing denied September 8,
petition for review denied October 20, 1970

# FAGALY ET AL, *Appellants, v.* STATE ACCIDENT INSURANCE FUND, *Respondent.*

471 P2d 441

*F. P. Stager*, Salem, argued the cause and filed the briefs for appellants.

*James P. Cronan, Jr.*, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Wallace Carpenter, Assistant Attorney General and Chief Counsel State Accident Insurance Fund, Salem.

Before SCHWAB, Chief Judge, and FORT and BRANCHFIELD, Judges.

FORT, J.

Clifford Fagaly was the owner and operator of Cliff's Drive-In restaurant. He, together with his wife, had run it successfully for 22 years. He was able to and upon occasion did perform every task involved in its operation. The business was located in Lincoln City, a resort area. Nevertheless it was open every day, only the hours reflecting the season of the year. The Fagalys lived next door to their business. The number of their employes varied according to the season and the needs of the business, ranging from themselves and their children to as many as 15 persons. Mr. Fagaly had elected to be, and was, covered by the Workmen's Compensation Act.

In August 1964, Mr. Fagaly suffered an acute myocardial infarction while attending a meeting at the city hall. He was hospitalized and treated for it by Dr. Robert Kaye, who remained thereafter as his personal and treating physician. He was permitted and returned to work in January 1965, but remained under treatment for the infarct until July 1965. He was placed and thereafter remained on daily medication consisting of Peritrate (a coronary vasodilator) and Hydrodiuril (a diuretic). Thereafter he remained regularly on the job, though he did see his doctor occasionally for wholly unrelated complaints. At no time during the period from July 1965 until his fatal attack did he complain of problems related to the heart condition. During the summer the business was open from 7 a.m. to 12 midnight. During the off-season the usual hours were from 11 a.m. to 11 p.m. During vacation times, however, as at Christmas, the hours again were longer. On December 19, 1967, the beginning of a vacation period, he worked from 9 a.m. to midnight with a one and one-half hour break in the early evening. After a normal night's rest, he, together with his wife, began work the following morning at 9 a.m. He first burned some boxes and did some routine cleaning. He also prepared some breakfast orders, the chili for the day, and then began making a lemon pie. While he was working on this in the normal way, his wife came into the kitchen from the dining room area. They then began conversing normally. He stopped a moment to stir the chili. He walked back to the pie. While he was doing so, his wife looked out the window for a moment. When she turned back he suddenly had become very pale, dropped his hand, and then without a word collapsed into her arms, and died immediately thereafter.

Two doctors testified. One was Dr. Kaye, his per-

sonal physician. He had had extensive experience in the diagnosis and treatment of heart conditions, regularly handling from ten to a dozen such cases yearly. The second was Dr. Riley, a Corvallis physician specializing in internal medicine, who regularly treated from 20 to 30 myocardial infarct cases each year. He was also an assistant clinical professor of medicine in the Division of Cardiology at the University of Oregon Medical School.

Dr. Kaye expressed the opinion that Mr. Fagaly's death was job-related because of the tensions under which he worked after the 1964 myocardial infarct. He was of the opinion that Mr. Fagaly "had developed a good collateral circulation in the area of his previous infarction," and thus that the second attack was not a further progression of the pre-existing diseased condition. He did not suggest, and no claim is here made, that the fatal attack was caused by any unusual circumstances which occurred while Mr. Fagaly was working on December 20. He did testify that though he had approved Mr. Fagaly's return to work in January 1965, he had not intended such long hours as he had worked on December 19, and expressed the opinion that these long hours were a significant part to the build-up of the stress and strain which ultimately resulted in his death. The testimony shows the following:

"Q. I had just one question that hasn't been cleared up. Since apparently, Doctor, there has been no sudden exertion or anything that precipitated this condition which brought on the death here but apparently was a build up of tensions over the years, this death, then, could have occurred—or could the death, in your opinion, have occurred either on or off the job with equal facility here, assuming that he isn't in bed? I mean, either in

normal activity at home or in normal activity at work.

"A. Yes."

Dr. Riley never saw nor treated Mr. Fagaly. He testified:

"A. * * * So I would say that strictly medically and scientifically if someone asked me: Did his job kill him, I'd have to say I couldn't say that it did.

"MR. CRONAN: You may cross-examine.

"CROSS EXAMINATION

"BY MR. STAGER:

"Q. Could you say it didn't?

"* * * * *

"A. I could say that I saw nothing on the December 20th day which killed him in the work that he was performing. I couldn't say that his method of making his living had nothing to do with the way he died."

He conceded that stress and strain "may be very important" but that since he did not know Mr. Fagaly he could not say whether it substantially contributed to his fatal attack nor the extent which stress and strain in his case was in fact job-related. He was of the opinion the treating physician, Dr. Kaye, could better judge this than he could.

The hearing officer concluded there was no legal causation because there was no "exertion capable of medically causing the result." Concerning medical causation he found:

"While it is recognized that no unusual strain in carrying out the job is necessary to establish the

exertion needed, and a usual exertion in employment may be enough to establish the necessary legal causation, that there must be some exertion as a material contributing factor in producing the heart attack. Neither of the doctors stated that there was any exertion in the legal sense capable of producing the results. Consequently, I find that there has been a failure of proof of medical causation."

Recovery was accordingly denied. Upon review the Workmen's Compensation Board found medical causation was not established. Concerning legal causation, it said:

"* * * The question of legal causation is not as clear, but because there is no evidence in the present record of any exertion medically capable of being a material contributing cause of the unfortunate result, we believe there has been a failure of legal causation as well."

In its order rejecting the claim it expressly rejected the "wear and tear rule" advocated by Arthur Larson in *The Heart Cases in Workmen's Compensation: An Analysis and Suggested Solution*, 65 Mich L Rev 441 (1967).

Upon appeal de novo to the circuit court, that court found:

"There was no medical evidence that claimant's decedent's death was caused or materially contributed to by his activities on December 19 and December 20, 1967."

Based thereon, the court concluded as a matter of law there was a failure of both legal and medical causation, and affirmed the board.

■ In *Sahnow v. Fireman's Fund*, 3 Or App 164, 470 P2d 378, decided June 11, 1970, we pointed

out that though "some jurisdictions require a claimant in such a case to show that he exerted unusual strain in carrying out his job," the rule in Oregon as set forth in *Coday v. Willamette Tug & Barge*, 250 Or 39, 48, 440 P2d 224 (1968), is "that the claimant's usual exertion in his employment is enough to establish the necessary legal causal connection."

This view was expressly reiterated in *Clayton v. Compensation Department*, 253 Or 397, 454 P2d 628 (1969), decided after this case was determined by the Workmen's Compensation Board. In that case, the Supreme Court considered the question of stress and strain as a basis for the establishment of legal causation in heart cases. That case dealt with a man who suffered a heart attack about six years prior to his fatal attack. No unusual exertion preceded the fatal heart attack, but the nature of his work involved extensive traveling, long hours and often evening and weekend work, all culminating in his becoming "extremely tired" shortly before his fatal on-the-job heart attack. The court said:

> "The foregoing evidence was ample to show a causal connection between the decedent's employment and the stress and fatigue which he suffered. * * *" 88 Adv Sh at 459.

Accordingly, in *Mayes v. Compensation Department*, 1 Or App 234, 237, 461 P2d 841 (1969), we held that in the heart attack case:

> "(3) The trier of fact must first consider whether or not the record establishes the existence of legal causation.
> "* * * * *
> "(5) In sustaining his burden of proof, claimant can establish legal causation simply by proof that he was exerting himself in a usual or normal way

in the performance of his job. He is not required to show that he exerted unusual strain or effort."

Larson, in his article, points out:

"\* \* \* [T]he causation issue can be solved by invoking the distinction which exists in compensation law between neutral-risk situations (where there is no obvious personal or employment element contributing to the risk) and personal-risk situations (where a personal risk contributes to the injury, although perhaps in a relatively small degree). \* \* \*

"In heart cases, the effect of applying this distinction between neutral-risk and personal-risk situations would be clear. If there is some personal causal contribution *in the form of a previously weakened or diseased heart,* a heart attack would be compensable only if the employment contribution takes the form of an exertion greater than that of non-employment life. Note that the comparison is not with *this employee's* usual exertion *in his employment,* but rather with the exertions present in the normal *non-employment* life of this or any other person. On the other hand, if there is no personal causal contribution, that is, if there is no prior weakness or disease, *any* exertion connected with the employment and causally connected with the collapse as a matter of medical fact would be adequate to satisfy the *legal* test of causation. This is the heart-case application of the actual risk test: *this* exertion in fact causally contributed to *this* collapse. In both situations, whether or not there was prior personal weakness or disease, the claimant would also have to show that *medically* the particular exertion contributed causally to the heart attack." (Italics in original.) 65 Mich L Rev at 469-70.

Here the deceased comes within the personal-risk group, for he had a "personal causal contribution in the form of a previously weakened or diseased heart."

Thus the test is whether the "employment contribution takes the form of an exertion greater than that of non-employment life." The question then is whether the stress and strain (i.e., the "exertion") attributable solely to his work was not only different from but substantially greater than the stress and strain of non-employment life.

■ The evidence here affirmatively showed that the deceased had no significant personal family or non-business problems which would have subjected him to unusual stress or strain. His was the normal life of a self-employed person carrying on a small business. Indeed his own business occupied his time and effort almost to the exclusion of non-employment activities. ORS 656.128 allows sole proprietors and business partners to elect to come under the Act. Decedent had done so and respondent had accepted him. Because such a person is usually exposed not only to greater employment-connected stress than is an employe, or that he does not have the protection of laws limiting, for example, his hours of work or his personal liability, are not reasons to deny him coverage otherwise available under the law. The respondent in such cases, as does the employer with his employe, takes such a man as he is, and his work as it is. *Keefer v. State Ind. Acc. Commission*, 171 Or 405, 135 P2d 806 (1943).

■ In accordance with the duties devolving upon us, as outlined in *Mayes v. Compensation Department*, supra, to try the matter de novo and to draw our own inferences from the evidence, we find that legal causation is established here.

■ This then brings us to the question of medical causation. It has been well said: "The compensability of cardiovascular problems remains one of the most

difficult areas in the field of Workmen's Compensation today." Comment, "Problems and Suggested Solutions to the Cardiovascular Cases in the Workmen's Compensation Field," 6 Will L J 95 (March 1970). The great difficulties in heart cases encountered in the area of medical-legal causation are well outlined in *Coday, Clayton* and *Sahnow, supra.*

In *Mayes, supra,* we said:

"It must then be determined whether the work-related stresses or exertion were a material contributing factor in producing the heart attack. This is a question of medical causation. In any given case this is a question of fact." 1 Or App at 237.

Dr. Kaye testified on cross-examination:

"Q. * * * It is my opinion, based on a reasonable certainty, that the prolonged labor expected in his business and the management problems contributed significantly to the fatal infarction in December of 1967. Would that be your opinion?

"A. That would be my opinion, yes.

"Q. Did you also hear Mrs. Fagaly say that there were no financial problems connected with the business?

"A. Yes.

"Q. What management problems did you have in mind in this last paragraph, Doctor?

"A. Well, as you heard her also state, they were approaching a holiday season; and she gave the example of this last weekend where they had been dealing with fifteen employees and then four employees with practically the same volume of business, and Cliff was anticipating this type of a program coming up which undoubtedly was putting him under a certain degree of nervous tension. He was also working a seven-day week without a whole lot of time off. Now, you'll recall that one of his

main outdoor recreations was golf, and at that time of the year golf on the Oregon coast is a rather slushy enterprise. So that his time off was—living right next door to the business, his time off was not too well taken care of as far as getting completely away from his business problems went. And in recent years, it has been quite well documented in medical literature that one of the main contributing features to myocardial infarctions in the younger individual appears to be not tobacco or overweight or high blood pressure but the amount of work that they have been doing; in many cases, the type of work that they have been doing.

"Q. Now, are you saying, Dr. Kaye, that what killed Mr. Fagaly was the work tensions connected with his work?

"A. It was the work tension related to the period of time that they were applied to him."

We note, too, that there was no evidence to contradict Dr. Kaye's opinion that a good circulation had developed around the 1964 infarct, nor otherwise to indicate any significant progression of the pre-existing diseased condition.

We agree with Dr. Riley that Dr. Kaye, the treating physician, could, better than he, judge both the extent and the effect of the job-related stress and strain on Mr. Fagaly.

In *Hoffman v. National Surety Corp.*, 91 Ga App 414, 417, 85 SE2d 784 (1955), the court in considering the need for medical-factual causal connection, said:

"* * * [I]t must be shown by evidence, opinion or otherwise, that the exertion attendant upon the duties of employment, no matter how slight or how strenuous, and no matter with what other factors—such as pre-existing disease or predisposition to attack—it may be combined, was sufficient to contribute toward the precipitation of the attack.

Where evidence as to the work engaged in shows it to be sufficiently strenuous, or of such a nature that, combined with the other facts of the case, it raises a natural inference through human experience that it did so contribute, this is sufficient. In other cases, the opinions of experts that the exertion shown by the evidence to exist would be sufficient is also sufficient to authorize a finding on the part of the fact-finding tribunal that it did. But, in one way or another, the fact must appear."

We conclude both from the evidence itself and the opinion of Dr. Kaye that the claimant has also established the necessary medical causation.

The judgment is therefore reversed and remanded with direction to respondent to accept the claim.