# WILLIAMS, *Petitioner,*
### *v.*
# BURNS INTERNATIONAL SECURITY SERVICES, INC., *Respondents.*
## (WCB No. 77-69, CA 10286)
585 P2d 734

Sidney A. Galton, Portland, argued the cause for petitioner. With him on the brief was Galton, Popick & Scott, Portland.

Frank A. Moscato, Portland, argued the cause for respondent. With him on the brief was Gearin, Landis & Aebi, Portland.

Before Schwab, Chief Judge, Thornton and Buttler, Judges.

BUTTLER, J.

## BUTTLER, J.

Claimant in this workers' compensation proceeding is the wife and beneficiary of a deceased worker. Although she was ultimately denied death benefits, the delay in the processing of her claim gave rise to an award of approximately one year's worth of benefits denominated temporary total disability. She was also awarded a 5 percent penalty, assessed against the carrier. She was not, however, awarded burial costs. She appeals, contending that: (1) she should have been awarded interim spousal benefits rather than temporary total disability; (2) she should have been awarded burial and cemetery costs; (3) the 5 percent penalty assessed is inadequate in light of the length of the delay, and (4) denial of death benefits was error.

I

Vernon E. Williams (decedent) was employed by Burns International Security Services, Inc., as a security guard at a bank from May 24, 1974, until he died as a result of a heart attack on January 22, 1976. He was seen by his wife's physician in July, 1973, for a physical examination, which revealed hypertension, but did not complain to his wife of any symptoms which may have been associated with his hypertension, and did not see any doctor after July of 1973.

Most of the evidence concerned the emotional condition of decedent. It indicates that he was a reliable, conscientious worker. He was concerned that he was not well-paid for what he considered to be substantial responsibility. A co-worker described him as "a worry-wart-type who was very nervous and worried about every little thing."

Physically, however, his job was not taxing, although the week of his death he had worked 41 hours in four days, and often worked overtime. His primary responsibility was guarding access to the money vault, which he did by controlling electronic gates from a central console.

[ 771 ]

Decedent's last day at work was unusual in only one respect: at lunch time an employee breached security by leaving a stack of cash ($12,000—$20,000) outside the vault area. Decedent and the vault custodian, Mrs. Lachenmeier, placed the cash inside the vault. Mrs. Lachenmeier gave statements to each party and testified at the hearing. According to her, the incident was "highly unusual, and was worrisome for both of us until we had arranged for [the money's] security." One year prior to the hearing, in a written statement, she stated that the incident was "very upsetting to Vern given his nature and devotion to doing his job right." Shortly after lunch, Mrs. Lachenmeier, who was required to fill in for an absent employee, sat and talked with decedent. She stated,

"As I sat there we talked some, but it was very obvious Vernon was not feeling well. His face was flushed and red which was not usual. He was unusually quiet that day. He sat rubbing his neck and complained of feeling choked up in his throat. He was never one to complain but revealed this to me when I asked him if he was alright. It was obvious to me he was not.

"As was the custom someone had provided a cake for vault employees. I had a piece and cut a piece for Vern who usually ate a piece. This time he said he could not eat it and put it in a drawer. He complained he was choked up and could not swallow.

"* * * He was quite nervous that day because he was trying to cut down on his smoking."

In her later statement, she amplified that conversation with decedent:

"I asked him if he felt all right. He replied in general terms that he didn't feel well; he said he was cutting down on smoking and because his wife had recently broken her foot, he was doing the housework and carrying her up and down stairs at their home. It was 'getting to him' he said."

He ate dinner that night, but related his illness of the afternoon to his wife, who testified,

"Well, he said that after lunch he had gotten back to work, and he felt real sick; and, then, I asked him, 'In

what way?'; and he said, well, his neck felt stiff, his jaws hurt, his teeth hurt, and that he had difficulty swallowing, but that then did pass over, and he felt that he should stay and finish his day's work * * *."

Decedent cleared the dinner dishes from the table, and he and his wife watched television for awhile. At about 9 p.m. he went upstairs (approximately 12 steps) to prepare his wife's bed. He came back downstairs and spoke to her briefly, then returned upstairs to retire. When claimant retired that evening at 10 p.m., she discovered decedent was in bed, but did not respond when she called to him; he had no pulse that she could detect. An ambulance was called. The death certificate (without benefit of an autopsy) indicates decedent died at 11 p.m. that evening, the immediate cause being a myocardial infarction, due or as a consequence of coronary thrombosis, due or as a consequence of arteriosclerotic coronary artery disease.

Claimant filed a claim on January 28, 1976. The claim lay unprocessed for approximately one year. When a hearing finally was held, claimant was denied all relief. On appeal to the Workers' Compensation Board (Board), the order was modified to allow Mrs. Williams to collect temporary total disability payments from January 26, 1976, through January 12, 1977, plus a 5 percent penalty thereon and reasonable attorney fees. In all other respects, the Board affirmed the hearings officer.

## II

Claimant's first assignment of error, that temporary total disability was an inappropriate award, has been conceded by respondent. Accordingly, the Board's order is modified to reflect an award for interim spousal payments pursuant to ORS 656.204, from the date of death, January 22, 1976, to the date of the claim denial on January 14, 1977. *Jones v. Emanuel Hospital,* 280 Or 147, 570 P2d 70 (1977); *Williams v. SAIF,* 31 Or App 1301, 572 P2d 658 (1977).

## III

■ Claimant's second assignment of error is the failure of the Board to award her burial and funeral costs incurred, prior to the time her claim was denied. In *Jones v. Emanuel Hospital, supra,* the Supreme Court held that the statutory scheme contemplates that "interim compensation" must be paid by an employer who does not deny the claim within 14 days from the date of its notice or knowledge thereof until the claim is denied, even though the claim is determined ultimately to be noncompensable. In arriving at that result, the Court construed the word "compensation," in the context of ORS 656.262,[1] to mean "interim

[1] ORS 656.262 provides:

"(1) Processing of claims and providing compensation for a worker in the employ of a contributing employer shall be the responsibility of the State Accident Insurance Fund, and when the worker is injured while in the employ of a direct responsibility employer, such employer shall be responsible. However, all employers shall assist the fund or their insurers in processing claims as required in this chapter.

"(2) The compensation due under this chapter from the fund or direct responsibility employer shall be paid periodically, promptly and directly to the person entitled thereto upon the employer's receiving notice or knowledge of a claim, except where the right to compensation is denied by the direct responsibility employer or fund.

"(3) Contributing employers and carrier-insured employers shall, immediately and not later than five days after notice or knowledge of any claims or accidents which may result in a compensable injury claim, report the same to the fund or other insurer. The report shall include:

"(a) The date, time, cause and nature of the accident and injuries.

"(b) Whether the accident arose out of and in the course of employment.

"(c) Whether the employer recommends or opposes acceptance of the claim, and his reasons.

"(d) Any other details the fund or other insurer may require.

Failure to so report subjects the offending employer to a charge for reimbursing the fund for any penalty the fund is required to pay under subsection (8) of this section because of such failure.

"(4) The first instalment of compensation shall be paid no later than the 14th day after the subject employer has notice or knowledge of the claim. Thereafter, compensation shall be paid at least once each two weeks, except where the director determines that payment in instalments should be made at some other interval. The director may by regulation convert monthly benefit schedules to weekly or other periodic schedules.

compensation" rather than "all benefits * * * provided for a compensable injury," which is the definition set forth in ORS 656.005(9).[2] The Court pointed

"(5) Written notice of acceptance or denial of the claim shall be furnished to the claimant by the fund or direct responsibility employer within 60 days after the employer has notice or knowledge of the claim. The fund shall also furnish the contributing employer a copy of the notice of acceptance. The notice of acceptance shall:

"(a) Advise the claimant whether the claim is considered disabling or nondisabling.

"(b) Inform the claimant of hearing and aggravation rights concerning nondisabling injuries including the right to object to a decision that his injury is nondisabling by requesting a determination thereon pursuant to ORS 656.268.

"(6) If the State Accident Insurance Fund, the direct responsibility employer itself or its guaranty contract insurer or any other duly authorized agent of such employer for such purpose on record with the Director of the Workers' Compensation Department denies a claim for compensation, written notice of such denial, stating the reason for the denial, and informing the worker of hearing rights under ORS 656.283, shall be given to the claimant. A copy of the notice of denial shall be mailed to the director and to the contributing employer by the fund. The worker may request a hearing on the denial at any time within 60 days after the mailing of the notice of denial.

"(7) Merely paying or providing compensation shall not be considered acceptance of a claim or an admission of liability, nor shall mere acceptance of such compensation be considered a waiver of the right to question the amount thereof.

"(8) If the fund or direct responsibility employer or its insurer unreasonably delays or unreasonably refuses to pay compensation, or unreasonably delays acceptance or denial of a claim, the fund or direct responsibility employer shall be liable for an additional amount up to 25 percent of the amounts then due plus any attorney fees which may be assessed under ORS 656.382.

"(9) The fund may authorize contributing employers to pay compensation to injured workers and shall reimburse employers for compensation so paid.

"(10) The fund and all direct responsibility employers shall report every claim for disabling injury to the director within 21 days after the date the employer has notice or knowledge of such injury. If within one year after the injury, a worker claims a nondisabling injury has become disabling, the fund or direct responsibility employer shall report the claim to the director immediately after receiving notice or knowledge of such claim. A claim that a nondisabling injury has become disabling, if made more than one year after the date of injury, shall be made pursuant to ORS 656.273 as for a claim for aggravation."

[2] ORS 656.005(9) provides:

" 'Compensation' includes all benefits, including medical services,

out that the statutory definition was applicable, "except where the context otherwise requires." ORS 656.003. This rationale was followed in *Williams v. SAIF, supra.*

In order to sustain claimant's contention here, we would be required to hold, contrary to *Jones* and *Williams,* that "compensation" as used in ORS 656.262 means "all benefits," which would include burial expenses. ORS 656.204(1).[3] We decline to do so. Not only would such a holding distort the rationale of *Jones,* but it would be unjustified under the statutory scheme. The cost of burial is a lump sum payment, not to exceed $1,000, is incurred very shortly after death, and its nonpayment during investigation of the claim does not create the same hardship as does nonpayment of time-loss benefits. Further, if claimant is correct, burial costs would be payable in all cases unless the death claim is denied immediately.

The Board, therefore, properly denied these benefits to claimant.

## IV

█ Claimant's third assignment of error is that under the circumstances of this case a 5 percent penalty is inadequate. ORS 656.262(8) provides:

> "If the fund or direct responsibility employer or its insurer unreasonably delays or unreasonably refuses to pay compensation, or unreasonably delays acceptance or denial of a claim, the fund or direct responsibility employer shall be liable for an additional amount up to 25 percent of the amounts then due plus any attorney fees which may be assessed under ORS 656.382."

---

provided for a compensable injury to a subject worker or the worker's beneficiaries by a direct responsibility employer or the State Accident Insurance Fund pursuant to this chapter."

[3] ORS 656.204(1) provides:

"If death results from the accidental injury, payments shall be made as follows:

"(1) The cost of burial shall be paid, not to exceed $1,000 in any case."

No action was taken on claimant's claim for almost a full year. The Board found, "The employer has the obligation to process the claim and it is obvious here it was negligent in carrying out this obligation." Claimant relies heavily upon *Williams v. SAIF, supra,* where we said:

> "* * * [C]laimant had been disabled for 40 days but had been compensated for only one day of disability. SAIF did not fully update the payments even after being requested to do so, and at no time was the lag between entitlement and compensation less than two weeks. SAIF offers no substantial excuse for its tardiness. A 15 percent penalty, as imposed by the referee and the Board, is appropriately computed both as a sanction against SAIF and as payment to claimant for whatever difficulties may have been caused by the continuing delay. * * *" 31 Or App at 1305.

Claimant argues that if 15 percent penalty is appropriate where there is a general lag in excess of two weeks, complete neglect of a claim warrants the maximum of 25 percent penalty.

In *Williams,* we addressed the lack of "authority defining 'unreasonable delay' or applying the term in the context of the Workers' Compensation Act." 31 Or App at 1305. Having no legislative guidelines, "case-by-case development of workable rules," 31 Or App at 1305, is the only recourse. In this case, claimant retained counsel on the same day that she filed her claim, January 28, 1976. Although counsel proceeded to investigate the claim, taking statements from various witnesses over the course of the ensuing year, no communications were directed to the employer or carrier until January 3, 1977,[4] after which the claim was promptly processed.

■ While ORS 656.262(1) places the responsibility for processing claims upon the employer and its carrier,

---

[4]Employer's carrier received a "Request for Hearing" on January 6, 1977. The original form filed by claimant had been either misfiled or misplaced. Upon having the oversight called to its attention, carrier promptly processed the claim. The claim was denied January 14, 1977.

the holdings in *Williams* and *Jones* impose an expensive financial burden on them if they do not deny a claim promptly. The obligation to pay compensation for a noncompensable claim is, in itself, in the nature of a penalty, which provides an incentive to process claims expeditiously. The express penalty is in addition to the requirement that compensation determined not to be payable be paid. In determining the amount of penalty to assess, different factors may be relevant, depending upon the basis for assessing it. For example, a greater penalty might be justified for an "unreasonable" refusal to pay compensation admittedly due as opposed to an "unreasonable" delay in properly denying a claim. There should not, however, be an incentive to file a highly tenuous claim and, realizing that it has been mislaid, make no further inquiry for a year or more in order to obtain benefits (plus penalty) ultimately determined not to be owing.

In *Williams,* claimant's counsel objected to the delays and requested payments on three occasions subsequent to the filing of the claim. Here, while claimant retained counsel at the outset, there was no attempt to determine what had happened to the claim for almost one year. Considering that factor, plus the fact that the unreasonable delay here was in denying the claim rather than in refusing to pay the claim, we conclude the 5 percent penalty is reasonable.

## V

■ Finally, claimant appeals from the Board's determination that decedent's fatal attack was not compensable. The referee and the Board both found that neither legal nor medical causation had been established. In order to prevail, a claimant must establish both. *Foley v. SAIF,* 29 Or App 151, 155, 562 P2d 593 (1977).

■ We recognize that there is, and has been, confusion in determining what is legal and medical causation in heart cases, but that confusion appears to be inherent in such cases, and will continue to be, to some extent at

[ 778 ]

least, until the state of medical knowledge improves. In this case, claimant's contention is that decedent's heart attack was "caused" by on-the-job stress. In analyzing this contention, we accept as a valid proposition that medically, from a statistical standpoint, stress may be "a causative factor in these cases" where, as here, there is an absence of evidence showing that the case in issue is distinguishable from cases in general. *Clayton v. Compensation Department,* 253 Or 397, 402, 454 P2d 628 (1969). Given that starting point, the question becomes whether there is sufficient evidence to persuade this court, as the trier of fact, that decedent was under stress in carrying out his job (legal cause) and if so, whether that stress was a material contributing factor in producing the fatal heart attack (medical cause).

While there have been attempts to formulate rules to simplify the resolution of heart cases arising under Workers' Compensation acts, we are aware of none which achieve the desired simplification. Professor Larson proposes a "personal risk" evaluation rule. 1A Larson, Workmen's Compensation Law, § 38.83 (1973), which he originally explained in *The Heart Cases in Workmen's Compensation: An Analysis and Suggested Solution,* 65 Mich L Rev 441 (1967).[5] We

---

[5] "* * * [T]he causation issue can be solved by invoking the distinction which exists in compensation law between neutral-risk situations (where there is no obvious personal or employment element contributing to the risk) and personal-risk situations (where a personal risk contributes to the injury, although perhaps in a relatively small degree).* * *

"In heart cases, the effect of applying this distinction between neutral-risk and personal-risk situations would be clear. If there is some personal causal contribution *in the form of a previously weakened or diseased heart,* a heart attack would be compensable only if the employment contribution takes the form of an exertion greater than that of non-employment life. Note that the comparison is not with *this employee's* usual exertion *in his employment,* but rather with the exertions present in the normal *non-employment* life of this or any other person. On the other hand, if there is no personal causal contribution, that is, if there is no prior weakness or disease, *any* exertion connected with the employment and causally connected with the collapse as a matter of medical fact would be adequate to satisfy the

adopted that analysis in *Fagaly v. State Acc. Ins. Fund,* 3 Or App 270, 471 P2d 441, *rev den* (1970), and quickly discarded it in *Anderson v. S.A.I.F.,* 5 Or App 580, 587, 485 P2d 1236 (1971), because, we said, it was "at odds with the legal causation test set forth by the Oregon Supreme Court in *Coday* [v. *Willamette Tug & Barge,* 250 Or 39, 440 P2d 224 (1968).]"

■ In *Coday, supra,* the Supreme Court reiterated the standard for legal causation applicable in Oregon as recognizing that it is not necessary for a claimant to show that he exerted unusual strain in carrying out his job; his usual exertion in his employment is enough. There is, however, nothing in *Coday,* or any other Oregon cases we have found, which precludes us from considering evidence of nonemployment stress or exertion in weighing the evidence to determine whether the on-the-job stress was a material contributing cause. On the other hand, we read *Coday* to mean that it is not necessary for claimant to show that on-the-job stress or exertion was greater than that of nonemployment life in order to show legal causation, although such considerations are relevant to a determination of the ultimate question.[6]

■ Accordingly, we sit as a jury to review a cold record to determine, without the aid of any formula to ease the burden, whether the claimant has established by a preponderance of the evidence that on-the-job stress

---

*legal* test of causation. This is the heart-case application of the actual risk test: *this* exertion in fact causally contributed to *this* collapse. In both situations, whether or not there was prior personal weakness or disease, the claimant would also have to show that *medically* the particular exertion contributed causally to the heart attack." (Italics in original.,) 65 Mich L Rev at 469-70.

[6]In *Schartner v. Roseburg Lumber Co.,* 20 Or App 1, 3, 530 P2d 545 (1975), we said:

"* * * If routine employment requires exertion which is 'different from and substantially greater than the stress and strain of nonemployment life' nothing more than involvement in that employment need be shown, if the showing of it with other evidence carries the burden of proof to the satisfaction of the fact trier. * * *"

That statement was made with respect to medical causation.

[ 780 ]

was a material contributing cause in producing decedent's heart attack. We hold in this case that she has not.

The evidence is that decedent's job was a very sedentary one; there was only occasional modest physical exertion, and no stress other than decedent's desire, as a conscientious employee, to do a good job. The only evidence of what might be characterized as identifiable stress on the day he died was the fact that another employee had left a money box containing a substantial amount of cash on the counter outside the vault where it should have been secured. There is evidence that he was upset over this incident, even though it was quickly resolved with the aid of another employee. This evidence does not persuade us that decedent was subjected to stress, either usual or unusual, on the job.

But even if we assume that claimant has established that decedent was subject to on-the-job stress, the evidence does not persuade us that such stress materially contributed to decedent's death. To the contrary, the record shows that decedent was quite nervous the day of his death because he was cutting down on smoking and that his situation at home was "getting to him" because his wife had recently broken her foot, requiring him to do the housework and carry her up and down stairs.

The record contains medical reports from two doctors,[7] one of whom stated that "there is not enough evidence to indicate that Mr. Williams' work on January 22, 1976, was important in the pathophysiology of his final illness. * * * I do not believe that his work was a material contributing cause to his death." The other report stated that it was not evident that decedent had undergone "any undue or unusual stress related to his work." The report goes on to state that "a

[7] There is another report from a third doctor, which states only that he would need more information before expressing an opinion with respect to medical causation.

[ 781 ]

sudden stress or work situation could, indeed, precipitate a myocardial infarction." The report concludes:

"* * * As the symptoms that are compatible with but not diagnostic of an infarction began at work, I would certainly have to say it is likely that his final symptoms and possibly his death were work related. Again, there are too many variables to say that the job caused his death. The same course of events could have occurred had he not been working at all but there is no way that I can know."

It is not clear that the two doctors disagreed, but even if they did, the more favorable opinion is highly equivocal. We conclude that the evidence does not preponderate in claimant's favor, and we agree with both the referee and the Board that claimant has not sustained her burden of proof.

Affirmed as modified.