In the Matter of the Compensation of
the Beneficiaries of Robert A. Carter, Deceased.

CARTER,
*Petitioner,*

*v.*

CROWN ZELLERBACH CORPORATION,
*Respondent.*

(WCB No. 79-3038, CA 18767)

627 P2d 1300

Bernard Jolles, Portland, argued the cause for petitioner. On the brief were Robert A. Sacks, and Jolles, Sokol, Bernstein & Aitchison, P.C., Portland.

Mildred J. Carmack, Portland, argued the cause for respondent. With her on the brief were Paul R. Bocci, and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

YOUNG, J.

ROBERTS, J., dissenting opinion.

## YOUNG, J.

Claimant appeals from an order of the Workers' Compensation Board, reversing the opinion and order of the referee. This is an on the job heart-exertion death case. The issue is compensability. The Board, in reversing the referee, found that claimant failed to meet the burden of proving both legal and medical causation. We review *de novo* on the record. ORS 656.298(6). We reverse.

Decedent was 52 years old with atherosclerotic heart disease, a prior myocardial infarction and other ailments. He was a long-time employe at a Crown Zellerbach Corporation (Crown) sawmill. In recent years and at the time of death he was a barker machine operator.[1] On January 10, 1979, while sitting in the cab of the idle barker, he suffered heart failure and died soon thereafter.[2]

Claimant has the burden of proving by a preponderance of the evidence both legal and medical causation. *Coday v. Willamette Tug & Barge,* 250 Or 39, 440 P2d 224 (1968); *Riutta v. Mayflower Farms, Inc.,* 19 Or App 278, 527 P2d 424 (1974). Both are fact questions. *Mawhinney v. SAIF,* 43 Or App 819, 604 P2d 430 (1979).

Decedent reported to work for the swing shift around 4:30 p.m. Decedent and co-workers took a short break around 6:45 p.m., during which decedent made no complaints and no signs of illness were observed by others. The night was cold and decedent was dressed in a shirt and sweatshirt. He operated the barker until 8:05 p.m., when a breakdown occurred in the mill and decedent shut down the barker. When he shut down the barker, he exited from the barker cab and walked a short distance along a catwalk. From this point on there is little direct evidence of decedent's activity. His co-worker Smith was of the opinion that the decedent was headed to the lower mill level of the

---

[1] The barker machine, as its name implies removes bark from logs entering the mill. It is operated from a cab position several feet above the barker. The barker is operated by pressing buttons and foot pedals. Two barkers were operated from the cab, one by decedent and the other by co-worker Smith.

[2] We use the term "heart failure" to describe the cause of death more clearly. There is a definable medical difference between a myocardial infarction and a myocardial failure. The medical evidence indicates the immediate cause of death was due to myocardial failure.

barker to sweep up bark and debris with a pushbroom. No one observed the activity. In a very few minutes, decedent returned to the cab, took a hand tool called a pickaroon, (described as an axe handle with a hook on the end, weighing three pounds or less) and told Smith the barker was "plugged up." Decedent would have only known of the plugup by having gone to the lower mill level earlier, apparently to sweep.

Decedent left with the pickaroon and presumably descended a second time to the lower level of the barker to clear away the jam. No one saw him do that. Smith normally unplugged the barker, but it was not unusual for decedent to perform that task.[3] Smith said decedent returned to the cab level in seven minutes, replaced the pickaroon and said he would be back in a minute, walking in the direction of the foreman's ofice. Smith observed perspiration on the decedent's brow.[4] Co-worker Scott was in the foreman's office when decedent entered. Scott also observed perspiration on the decedent's brow. The decedent leaned against the office wall. He made no complaints and did not look ill. Decedent stayed in the office briefly and returned to the cab. Smith testified the decedent returned to the cab, after replacing the pickaroon, in about four minutes. No words were exchanged. Decedent took his seat in the cab and within minutes slumped in his seat unconscious. Shortly thereafter he was pronounced dead in a local hospital.[5]

To decide compensability, we must determine both legal and medical causation. *Coday v. Willamette Tug & Barge, supra,* explains causation as follows:

"* * * The first question is whether there is any evidence that plaintiff exerted himself in carrying out his job. This is a question of legal causation. The second question is

---

[3] To clear the jam, a worker stands on a slow moving conveyor chain, keeping positioned by walking in a treadmill like fashion and raking or chopping the jam away.

[4] Co-worker Smith described the job of cleaning a jam as, "sometimes it's easy and sometimes it's hard." The referee said "clearing a jam can be, but is not always, strenuous work." The refereee found the decedent had engaged in "moderately strenuous work." We accept that finding.

[5] From the record we estimate the period of time from leaving the cab to sweep, returning and leaving with the pickaroon, stopping by the foreman's office and returning to the cab and sitting down as roughly 20 minutes.

whether the exertion was a material contributing factor in producing the heart attack. This a question of medical causation." *250 Or at 47.*

## LEGAL CAUSATION

■ ■ The rule is that *usual* exertion on the job is sufficient to establish legal causation. *Coday v. Willamette Tug & Barge, supra; Anderson v. SAIF,* 5 Or App 580, 485 P2d 1236 (1971). In *Riutta v. Mayflower Farms, Inc., supra,* a heart case, we said, at p. 281,

> "The claimant may prove legal causation by showing that he was exerting himself in a normal and usual way in the performance of his job; he need not demonstrate unusual stress. (Citations omitted.)"

In this case, legal causation has been established. Crown argues there is no direct evidence of decedent's activities to show exertion and that decedent died while quietly sitting. We agree there is little direct evidence but find sufficient circumstantial evidence to satisfy the burden of proof, viz., sweeping, using a pickaroon and ascending and descending eight to ten steps all in a brief time interval. The circumstantial facts of exertion are more probably true than not. *Hutcheson v. Weyerhauser,* 288 Or 51, 602 Pd2d 268 (1979).

Crown asks us to retreat from our holding in *Anderson v. SAIF, supra,* by which we overruled Fagaly v. SAIF, 3 Or App 270, 471 P2d 441 (1970), which had adopted the *personal risk test* in determining legal causation in heart cases.[6] Recently, this court reaffirmed its rejection of

---

[6] Prof. A. Larson suggests the "Personal Risk Test" in his article, "The 'Heart Cases' in Workmen's Compensation: An Analysis & Suggested Solution," 65 Mich. L. Rev. 441 (1967). We quote:

> "[T]he causation issue can be solved by invoking the distinction which exists in compensation law between neutral-risk situations (where there is no obvious personal or employment element contributing to the risk) and personal-risk situations (where a personal risk contributes to the injury, although perhaps in a relatively small degree). * * *

> "In heart cases, the effect of applying this distinction between neutral-risk and personal-risk situations would be clear. If there is some personal causal contribution in the form of a previously weakened or diseased heart, a heart attack would be compensable only if the employment contribtion takes the form of an exertion greater than that of nonemployment life. Note that the comparison is not with this employee's usual exertion in his employment, but rather with the exertions present in the normal nonemployment life of this or any other person. * * *"

that test in *Williams v. Burns Int'l Security,* 36 Or App 769, 585 P2d 734 (1978). We agree with Crown that the Oregon Supreme Court has neither rejected nor accepted the doctrine. We decline to further refine the law on legal causation until we are satisfied that such a refinement would, in fact, be an improvement and of assistance in determining causation.[7]

## MEDICAL CAUSATION

Having found legal causation, we turn to the question of whether the exertion was a *material contributing factor* in causing heart failure and death. *Coday v. Willamette Tug & Barge, supra.*

The death certificate reports the immediate cause of death as, "acute myocardial infarct," as a consequence of "ten years" of "atherosclerotic heart disease." A subsequent autopsy report states, "death was due to acute myocardial failure secondary to the severe coronary atherosclerosis (with) acute plaque hemorrhage."

Decedent did not have an enviable medical history. He had diabetes mellitus for ten years or more; in 1969 he suffered a myocardial infarction; he had occasional angina attacks, atherosclerotic heart disease and hypertension. He was overweight and was described as being obese. Daily medication was taken for the diabetes and hypertension. He carried nitroglycerin for angina but took it infrequently. Two doctors described the decedent as having cardiovascular "risk factors."

■    Medical causation must be established by medical experts. *Foley v. SAIF,* 29 Or App 151, 562 P2d 593 (1977). There was *medical evidence from three physicans.* Charles M. Grossman, M. D., testified at the hearing for the claimant. Gene Smith, M. D., and Wayne R. Rogers, M. D., presented letter opinions at the request of Crown. Dr. Grossman's testimony supported causation. The opinions of the other doctors did not. We have to determine which medical hypothesis is most persuasive.

---

[7] We note that this court has not foreclosed consideration of the degree of exertion in non-employment life when considering medical causation. *See Williams v. Burns Int'l Security, supra,* and *Schartner v. Roseburg Lumber Co.,* 20 Or App 1, 3, 530 P2d 545 (1975).

■    Dr. Grossman is an internist. Part of his private practice involves cardiology. About half of his time is devoted to research. He had not treated or examined the decedent and based his opinion on decedent's medical history and the facts we have summarized. Essentially, the doctor's testimony was to the effect that it was medically probable that the exertion at work was the material precipitating cause of the *heart failure,* albeit, the decedent was vulnerable because of atherosclerotic heart disease and other diseases.

Dr. Grossman's explanation of the factors leading to decedent's heart failure, i.e. a myocardial failure, and their relationship to the physical exertion was persuasive. The referee found Dr. Grossman to be "a very credibile witness."

On the other hand, Dr. Rogers, a cardiologist, wrote, in part:

"My opinion, based on the above information, is that he had naturally progressive coronary disease based on multiple severe risk factors that culminated in triple vessel stenoses and then, for an undetermined reason, developed a hemorrhage into a plaque in the right coronary artery that led to sudden death. I see no causative or aggravating relationship between his work and this death, as the mechanism of plaque hemorrhage is unknown."

Dr. Rogers, like Dr. Grossman, had not treated or examined the decedent. Dr. Rogers based his opinion on the relevant medical records and an inclusive written description supplied by Crown of decedent's personal history and his activities at work on the day of his death.[8]

Dr. Roger's description of the cause of death, i. e., the hemorrhage of an artery, is consistent with Dr. Grossman's opinion. However, Dr. Roger's report, although recognizing that the decedent was working "normally" does not clearly indicate that Dr. Rogers appreciated the fact that decedent had exerted himself in carrying out his job. The referee articulated his finding, with which we agree, as follows:

---

[8] We are limited to an analysis of both Dr. Rogers and Dr. Smiths reports, without the benefit of direct or cross-examination.

Although not stated directly by Dr. Rogers, I conclude that he did not perceive that exertion preceded the decedent's collapse. As to the hemorrhage that "Led to sudden death", I was persuaded by Dr. Grossman's explanation of its "mechanism."

Gene Smith, M. D., had been decedent's doctor since 1969. Dr. Smith signed the death certificate, describing the immediate cause of death as "myocardial infarct." The autopsy report, Dr. Grossman, and apparently Dr. Rogers, describe death due to myocardial failure. Dr. Smith refers to a myocardial infarct again in his written opinion of April 26, 1979.[9] Dr. Smith *discounted any exertion* when he wrote:

"* * * such stresses as exertion * * * seem to be absent. Therefore, I feel his myocardial infarction was a result of the natural progression of his [atherosclerotic heart] disease and it just happened that his death occurred at work."

We conclude, as did the referee, that claimant has established legal and medical causation and hence compensability by a preponderance of the evidence.

Reversed.

**ROBERTS, J.,** dissenting.

I dissent. I would affirm the Board.

---

[9] There is little evidence in the record to support Dr. Smith's opinion that death was due to a myocardial infarction. All three physicians had the autopsy report for review prior to expressing their opinions. The autopsy reported was prepared after the death certificate but before Dr. Smith's written opinion describing death due to a myocardial infarction. Dr. Grossman's testimony clearly makes a distinction between the two diagnoses. Although not stated directly, we conclude that Dr. Roger's report was premised on a death caused by myocardial failure.